Filed 6/24/26  P. v. McCoy CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LEJON MARQUIS McCOY,<br><br>Defendant and Appellant. | F088827<br><br>(Super. Ct. No. F21906019)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gregory T. Fain, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Lejon Marquis McCoy (appellant) shot and killed Rafael Llamas.  As appellant left the scene on foot, he stopped and pointed the same firearm at Marco S., who had just witnessed the shooting.  Appellant pulled the trigger, but the firearm did not discharge.

A jury convicted appellant of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd (b); count 1)[1] with an enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and assault with a firearm (§ 245, subd. (a)(2); count 2) with an enhancement for the personal use of a firearm (§ 12022.5, subd. (a)).  The trial court sentenced appellant to 40 years to life plus five years in state prison.

On appeal, appellant challenges several portions of the prosecutor's closing argument and contends defense counsel was ineffective for failing to object.  We reject these claims.  We agree, however, that the conviction on count 2 must be reversed for insufficient evidence.  The evidence showed the firearm was unloaded or inoperable at the time of the alleged assault, and the prosecution presented no evidence that appellant nevertheless had the "present ability[] to commit a violent injury on the person of another" with the firearm.  (§§ 240, 245, subd. (a)(2).)  We reverse count 2, vacate appellant's sentence, and remand the matter for resentencing.  In all other respects, we affirm.

## BACKGROUND

### I.    Testimony of Marco S.

In July 2021, Llamas lived in an encampment of unhoused persons near downtown Fresno, colloquially known as "Tent City."  Marco S. lived at a residence near the encampment with his sister, who was married to Llamas but separated from him.  At his

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

sister's request, Marco regularly went to Tent City to bring food to Llamas. Marco also worked with an organization that delivered food to unhoused persons in the encampment.

On July 16, 2021, Marco S. walked from his residence to the county jail to pick up someone who was expected to be released from custody that day. His route to the jail took him through Tent City. After discovering the person would not be released as expected, Marco walked home alone.

Marco S. testified that he reached an alley leading toward Tent City around 7:45 p.m. It was still light outside. While walking through the alley, he heard footsteps behind him. Marco turned and saw appellant, whom he knew as "Diddy," walking quickly behind him. Appellant was holding a handgun behind his back and wore a T-shirt over his head, covering his hair and neck but leaving his face visible from chin to forehead.

Appellant proceeded past Marco S. and continued toward Llamas's tent. When appellant was about 40 feet from the tent, Marco heard appellant call out, "Paisa."[2] Appellant then raised the gun and fired a single shot at Llamas but did not hit him. Llamas tried to run, but appellant followed and fired several more shots from about three feet away. Llamas was hit multiple times and fell to the ground.

After the shooting, appellant quickly returned up the alley from which he had come. Marco S., who was still in the alley, attempted to duck behind an abandoned car. As appellant walked past him, he stopped briefly, extended his arm and pointed the gun at Marco from a distance of about 12 feet. Marco heard a sound "like a click," but the gun did not fire. Marco testified it appeared that appellant pulled the trigger but noted that he was looking at appellant's face. Appellant then continued up the alley.

---

[2] The court-certified Spanish interpreter explained that "paisa" is a Mexican slang term that can mean "paisano," referring to a person from the same country or land, and can also refer to someone from Mexico as opposed to someone born in the United States. The lead detective assigned to appellant's case further testified that "paisa" can be derogatory depending on how it is used.

Marco S. testified on cross-examination that he believed the gun did not discharge when appellant pointed it at him and pulled the trigger because appellant had run out of bullets while shooting Llamas. On redirect, he clarified that he heard gunshots during the shooting of Llamas but did not hear the "click" until appellant was in front of him.

After appellant left the area, Marco S. ran to Llamas and found he was still alive. No one at Tent City would let Marco use a cell phone to call for help, so he ran back to his residence, about two blocks away, to get his own phone. After discovering his cell phone battery was dead, he ran back to Tent City and found a pedestrian who allowed him to use her phone to call the police. He remained in the area and spoke with responding officers, and he was interviewed by detectives later that night.

Marco S. testified he had seen appellant in Tent City earlier that month, when Marco went there to sell watermelons left over from a party. While inside another person's tent, Marco saw appellant showing a gun to someone else. Marco explained that he recognized appellant because, about six years earlier, he had allowed appellant and another unhoused person to stay in his apartment for a week at a friend's request. Marco did not closely examine the gun and could not say whether it was the same firearm used in the shooting.

Marco S. initially did not identify appellant as the shooter when detectives interviewed him on the night of the shooting. He explained that he was scared and did not want to be labeled a "snitch." The next day, Marco contacted detectives and identified appellant, explaining that "it's family," and he "couldn't stay quiet." Two days later, he provided additional information, telling detectives he had seen appellant and his girlfriend in a Honda sedan with a broken rear window covered in plastic.

Four days after the shooting, Marco S. viewed a blind sequential photographic lineup containing six individuals, including appellant. Marco identified appellant as the shooter, telling the administering detective he was 80 to 90 percent certain. At trial,

4.

Marco clarified that he recognized appellant in the photograph and was "very sure it was him," but "didn't want to make a mistake either."

## II.    Law Enforcement Response and Initial Investigation.

Officers were dispatched to Tent City on the night of the shooting at 7:49 p.m. They located Llamas's body on the ground between two tents. Officers observed gunshot wounds and blood pooling around the body and were unable to detect a pulse. Seven expended nine-millimeter cartridge casings were found near the body. An autopsy revealed Llamas suffered multiple gunshot wounds. The fatal wound was a gunshot to his lower chest that perforated his heart and left lung.

Three days after the shooting, detectives located a car parked near Tent City that matched Marco S.'s description of the car associated with appellant and his girlfriend: a Honda sedan with a broken rear window covered in plastic. Later that day, surveilling officers observed appellant get into the front passenger's seat carrying an ice chest. J.O., appellant's girlfriend, sat in the driver's seat, and two other individuals sat in the back seat. Officers followed the car and conducted a traffic stop. During a search of the car, officers found a cell phone bearing the name "Diddy" and an ice chest marked "Diddy's Blood." Officers also recovered an unloaded magazine for a nine-millimeter handgun.

## III.    Appellant's Law Enforcement Interview.

After the traffic stop, appellant and J.O. agreed to accompany detectives to the police station to be interviewed. A recording of appellant's interview was admitted into evidence and played for the jury.

Appellant stated he had been in a relationship with J.O. for more than four years. At the time, he was unhoused, often slept in J.O.'s car, and regularly visited his grandmother near Tent City. He also claimed the magazine found in the car was his, stating he had purchased it from someone and intended to resell it for a profit.

Appellant gave the following account of his whereabouts on the day of the shooting. Around 2:00 p.m., he was with J.O. at the Poverello House, a charitable

organization and shelter for the unhoused located approximately one mile north of Tent City. Around 4:00 p.m., appellant and J.O. argued, and appellant walked alone to his grandmother's house. J.O. arrived there in her car around 5:30 p.m. Around 7:00 p.m., appellant and J.O. returned to the Poverello House, then left for the grocery store to buy milk. On the way, appellant got into a heated argument with someone on the street, so appellant and J.O. went instead to a friend's house. Later, they returned to the Poverello House and spent the night at an apartment belonging to "Mama Cat."

Appellant stated he heard about the shooting on the news. Although he had seen Llamas around before, appellant said he did not know Llamas's name. Appellant claimed he was at the Poverello House when the shooting occurred and did not hear the shots.

Detectives told appellant, as a ruse, that surveillance video showed him running from the shooting scene toward his grandmother's house shortly after the shooting. Appellant then changed his account, claiming he had gone near Tent City to meet his cousin, who was bringing him a pipe. He stated he heard gunshots and ran back to his grandmother's house. Appellant denied shooting Llamas, and he was released at the conclusion of the interview.

## IV.     Appellant's Arrest and Recovery of the Murder Weapon.

Eight days after the shooting, officers were dispatched to an area near the Poverello House in response to a reported domestic violence disturbance. Upon arrival, the officers observed appellant standing a few feet from a shopping cart. A group of other unhoused individuals was on the sidewalk at least 15 feet away. As the officers approached, appellant moved toward the shopping cart. One officer saw appellant reach into the cart with a dark object in his hand and appear to place it inside. Appellant then walked over to the others on the sidewalk. The officers searched the cart and recovered a nine-millimeter Glock handgun. Neither the gun nor the magazine contained any ammunition.

6.

Appellant was placed under arrest. He denied possessing the gun and claimed he had been trying to hide a pipe in the shopping cart. Officers searched in and around the cart but found no pipe. A methamphetamine pipe was instead found on appellant's person during a search incident to arrest.

The prosecution's firearm examiner test-fired the Glock handgun and compared the test-fired casings to the seven casings recovered from the shooting scene. Based on her microscopic examination of striations on the casings, the examiner opined that all seven casings recovered from the scene were fired from that handgun.

## I. V. Defense Evidence.

J.O. testified that she was in a dating relationship with appellant.[3] They were unhoused and slept in various places, including a tent encampment near the Poverello House, and inside her car. She acknowledged that appellant went by the nickname "Diddy." Appellant's grandmother lived near Tent City, approximately a five-minute walk from the Poverello House, and appellant and J.O. visited her home often.

J.O. further testified that she and appellant were parked near Tent City listening to music on the night of the shooting. Around 6:30 p.m., appellant left on foot without telling her where he was going, which J.O. said he often did. J.O. went looking for him and found him at his grandmother's house about eight to 10 minutes later. It was still light outside when she found him. According to J.O., appellant had gone there to refrigerate some food. Afterward, they argued for a few minutes and then went to Mama Cat's apartment, which was at the Poverello House.

Appellant's aunt, B.N., testified that she arrived at appellant's grandmother's house around 3:00 p.m. on the day of the shooting. Appellant was making sandwiches when she arrived. According to B.N., appellant later slept on the couch and left the house

---

**3**     J.O. was called as a witness by both the prosecution and the defense.

sometime after dark, although she was unsure of the time.  She learned of appellant's arrest two to three weeks later.

The prosecution called a defense investigator who spoke with B.N. approximately two years after the shooting.  The investigator testified that B.N. reported arriving at appellant's grandmother's house around 3:00 p.m. on the day of the shooting, and that appellant left approximately two and a half hours later.

A psychologist retained by the defense testified as an expert in memory and eyewitness identification.  He discussed factors that may affect witness recollection and identification reliability, including the manner in which a photographic lineup is administered.

## DISCUSSION

### I. Appellant's Conviction for Assault with a Firearm Must Be Reversed for Insufficient Evidence.

Appellant challenges the sufficiency of the evidence to sustain his conviction for assault with a firearm.  (§ 245, subd. (a)(2); count 2.)  He contends the evidence established the firearm was unloaded or inoperable when he pointed it at Marco S. and pulled the trigger, and thus, he lacked the "present ability" to apply force with a firearm.  (§ 240; see CALCRIM No. 875.)  We agree.[4]

#### A. *Additional background.*

The jury was instructed on the elements of assault with a firearm with CALCRIM No. 875.  As to the present ability element, the instruction required the jury to find:

---

[4]     Because we conclude substantial evidence did not support the present ability element, we do not reach appellant's additional claim that the evidence failed to establish another element of assault with a firearm: that he committed " 'an act with a firearm that by its nature would directly and probably result in the application of force to a person.' " (CALCRIM No. 875.)

"When [appellant] acted, he had the present ability to apply force with a firearm to a person."**5**

During closing argument, the prosecutor contended appellant assaulted Marco S. with a firearm by pointing a gun at him and pulling the trigger. Addressing the present ability element, the prosecutor argued: "[W]e don't know if it was a malfunction of the gun or whether he was out of bullets at the time. Either way, that element is still met. If you believe it's malfunction, still met. If you think he's out of bullets, that element is still met."**6** Defense counsel did not address the elements of assault with a firearm in closing argument, focusing instead on identity and alibi.

## B. *Applicable law – assault with a firearm and the present ability element.*

Section 245, subdivision (a)(2), criminalizes the commission of an "assault upon the person of another with a firearm." "Assault" is defined by statute as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)

Assault is a "general intent crime." (*People v. Williams* (2001) 26 Cal.4th 779, 788.) It requires proof that the defendant " 'willfully committed an act that by its nature will probably and directly result in injury to another.' " (*Id.* at p. 782.) Further, the defendant must have been "aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result." (*Id.* at p. 788.)

---

**5**    Our reversal of count 2 for insufficient evidence makes it unnecessary to decide appellant's claim that the trial court had a sua sponte duty to instruct the jury that present ability requires the " 'physical means' " to apply force.

**6**    In a separate claim, appellant contends this argument was a misstatement of the law, and that defense counsel was ineffective for failing to object. In light of our discussion of the present ability element below, the prosecutor's assertion that it was immaterial whether appellant's gun was unloaded or inoperable appears inconsistent with applicable law. However, because we reverse count 2 for insufficient evidence, we need not address this claim further.

9.

The actus reus of assault is the "present ability[] to commit a violent injury on the person of another." (§ 240, see *People v. Chance* (2008) 44 Cal.4th 1164, 1172 (*Chance*).) It is the "action enabling [a defendant] to inflict a present injury." (*Chance*, at p. 1172.) "The present ability element … is satisfied when 'a defendant has attained the means and location to strike immediately.' " (*Id.* at pp. 1167–1168; accord, *People v. Licas* (2007) 41 Cal.4th 362, 370.) "In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion … even if the defendant is several steps away from actually inflicting injury." (*Id.* at p. 1168, fn. omitted.)

As a general rule, a defendant cannot commit assault with a firearm using an unloaded or inoperable weapon, unless the firearm is used as a club or bludgeon. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3; *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544; *People v. Ranson* (1974) 40 Cal.App.3d 317, 321 (*Ranson*); *People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6; *People v. Valdez* (1985) 175 Cal.App.3d 103, 110–111; *People v. Wolcott* (1983) 34 Cal.3d 92, 102; *People v. Orr* (1974) 43 Cal.App.3d 666, 672.) The reason is straightforward: absent the means to fire the weapon, the defendant lacks the "present ability to commit a violent injury on the person threatened, in the manner in which the injury is attempted to be committed." (*People v. Sylva* (1904) 143 Cal. 62, 64; accord, *People v. Lee Kong* (1892) 95 Cal. 666, 669 ["it cannot be said that a person with an unloaded gun would have the present ability to inflict an injury upon another many yards distant"]; *Mosqueda, supra,* 5 Cal.App.3d at p. 544 [person pointing an unloaded gun at another has " 'no present ability to commit a violent injury' "]; *Valdez, supra,* 175 Cal.App.3d at p. 112 [assault defendant with an unloaded gun lacks "personal means to inflict" injury]; see also *Chance, supra,* 44 Cal.4th at p. 1173, fn. 11 ["as the unloaded gun cases demonstrate, the defendant must have an actual, not merely apparent, ability to inflict injury"].)

This rule, however, is not categorical. (*People v. Lattin* (2024) 107 Cal.App.5th 596, 612 (*Lattin*) [there is no "brightline-rule" requiring a loaded firearm].) Consistent with *Chance*'s explanation that present ability requires only " 'the ability to inflict injury on the present occasion,' " courts have recognized that an unloaded or inoperable firearm may support assault liability where the evidence establishes the defendant had the means to load and/or render it operable immediately. (*Lattin,* at p. 620; *Ranson, supra,* 40 Cal.App.3d at p. 321.)

*Lattin* provides a useful illustration of present ability despite an unloaded firearm. There, the defendant pointed a shotgun at several people, then unsuccessfully attempted to flee in a friend's car. (*Lattin*, *supra*, 107 Cal.App.5th at pp. 602–605.) Responding officers searched the car and located the shotgun in the trunk. (*Id.* at p. 607.) The shotgun was unloaded, but three shotgun shells were discovered in the cupholder of the car. (*Ibid*.) A firearms expert testified that a person competent and familiar with the shotgun could load it and make it ready to fire within seconds. (*Id.* at p. 608.)

The Court of Appeal held this evidence was sufficient to establish present ability. (*Lattin, supra*, 107 Cal.App.5th at p. 621.) The court explained that, even assuming the shotgun was unloaded when the defendant pointed it at the victims, the jury could reasonably have concluded that he "had ammunition readily available and was capable of loading and racking the shotgun 'immediately.' " (*Id.* at pp. 622–623.) The evidence also showed the defendant was familiar with the weapon, having "racked and pumped it" on several occasions. (*Id.* at p. 623.)

*Ranson* likewise illustrates that present ability may exist even where the firearm temporarily malfunctions. The defendant in *Ranson* aimed a rifle at a police car. (*Ranson, supra*, 40 Cal.App.3d at p. 319.) After he was subdued, officers discovered there was no round in the chamber of his rifle because a cartridge in the magazine had jammed. (*Id.* at pp. 319–320.) The court nonetheless concluded sufficient evidence supported the present ability element. (*Id.* at p. 321) It emphasized the "unique fact

11.

situation" before it: the rifle was "definitely loaded and operable," the top cartridge had jammed, and the evidence supported an inference that the defendant knew how to remove and rapidly reinsert the clip. (*Ibid.*)

In sum, these authorities show there is no per se requirement that a firearm be loaded and operable to establish present ability. But when the firearm is unloaded or temporarily incapable of firing, the evidence must show that the defendant had the immediate means to load it or otherwise render it capable of discharge.

### C.     *Standard of review.*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 821.)

### D.     *Substantial evidence did not support the jury's finding that appellant had the present ability to apply force with a firearm.*

Marco S. testified that appellant pointed the gun at him and pulled the trigger, but the gun did not discharge. The only reasonable inference is that the firearm was not capable of firing at that operative moment. The prosecutor conceded the point in substance, telling the jury, "[W]e don't know if it was a malfunction of the gun or whether he was out of bullets at the time." But while the precise reason the gun failed to fire remained unclear, the critical fact was not: when appellant pulled the trigger, the gun did not work. Whether appellant had exhausted the ammunition while shooting Llamas,

12.

the gun had jammed or malfunctioned, or some other condition prevented it from firing, the record contains no evidence that appellant had the immediate ability to discharge the weapon. Because the evidence did not show appellant's conduct was "coupled with a present ability[] to commit a violent injury on the person of another," the element was not satisfied. (§ 240.)

Respondent acknowledges that the jury could reasonably have inferred appellant ran out of ammunition while shooting Llamas but maintains the jury also could have drawn several alternative inferences supporting guilt. We find no substantial evidentiary support for those alternatives.

First, respondent claims the jury could reasonably have inferred present ability because appellant had just used the firearm to shoot and kill Llamas. But the relevant inquiry is whether appellant had the present ability to inflict injury at the time of the alleged assault on Marco S. The prior shooting does not overcome the affirmative evidence that, when appellant later pointed the gun at Marco and pulled the trigger, the gun did not fire.

Respondent next argues the jury could have concluded the gun remained loaded and operable, but that appellant pointed it at Marco S. "only as a warning." The record does not support such a finding. Marco testified appellant did more than point the gun; he pulled the trigger. That testimony foreclosed respondent's proposed inference.

Lastly, respondent asserts that even if the jury found the gun was unloaded or malfunctioning, it could have inferred that appellant had the ability to reload the gun or correct the malfunction quickly because he had demonstrated "proficiency" with the weapon in killing Llamas. The record contains no evidence supporting those inferences. Unlike in *Lattin*, there was no evidence appellant possessed or had immediate access to additional ammunition. No unspent ammunition was found at the scene, on appellant during either police contact, or in the firearm when officers recovered it from the shopping cart. Nor was there testimony establishing how quickly the firearm could have

13.

been reloaded. And unlike in *Ranson*, the record contains no evidence identifying the nature of any possible malfunction or explaining what steps would have been necessary to render the firearm capable of firing. On this record, respondent's proposed inferences rest on conjecture, not substantial evidence.

In reaching this conclusion, we are mindful of the highly deferential standard of review, under which we draw all reasonable inferences in favor of the judgment. Even so, given the affirmative evidence that the firearm was unloaded or inoperable during the alleged assault, it was incumbent upon the prosecution to present evidence from which the jury could reasonably infer appellant nevertheless had the immediate ability to discharge it. The record contains no such evidence.

Accordingly, the conviction on count 2 must be reversed for insufficient evidence, and double jeopardy bars retrial on that charge. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 39.) The associated firearm enhancement (§ 12022.5, subd. (a)) necessarily falls with the conviction.[7] We vacate appellant's sentence and remand the matter for resentencing.[8]

## II. Defense Counsel Was Not Ineffective for Failing to Object to the Prosecutor's Challenged Comments During Closing Argument.

Appellant raises several claims of prosecutorial misconduct based on the prosecutor's closing argument. He asserts the prosecutor misstated the testimony of J.O., misstated the law by suggesting that a defendant cannot rely on inconsistent defense theories, and erroneously argued that the testimony of alibi witnesses must match.

---

[7]    Appellant separately contends, and respondent agrees, that the firearm enhancement attached to count 2 must be vacated because it was not alleged in the information. We need not reach that pleading issue. Because count 2 must be reversed for insufficient evidence, the attached enhancement must be vacated as well.

[8]    A full resentencing is appropriate when part of a sentence is stricken on review. This permits the trial court to exercise its sentencing discretion in light of the changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) We express no opinion regarding how the trial court should exercise its sentencing discretion upon remand.

14.

Although appellant concedes no objection was raised below, he contends defense counsel's failure to object amounted to ineffective assistance. We reject each claim.

## A. *Standard of Review.*

Prosecutorial misconduct occurs when " '[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury." (*People v. Parson* (2008) 44 Cal.4th 332, 359; see *People v. Fayed* (2020) 9 Cal.5th 147, 204 ["It is prosecutorial misconduct to misstate the law"].) "When a claim of misconduct is based on the prosecutor's comments before the jury, … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 305.) Appellant concedes defense counsel did not object to the alleged misconduct but contends defense counsel's failure to object constituted ineffective assistance.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 357.) The claimant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

**B.** *Alleged misstatement of J.O.'s testimony.*

Appellant first contends the prosecutor committed misconduct by misstating J.O.'s testimony concerning appellant's whereabouts on the night of the shooting.

As summarized above, J.O. testified that appellant left on foot around "6:30-ish" while they were parked near Tent City listening to music. She later found him at his grandmother's house, where he had gone to refrigerate some food. J.O. estimated that it took "about" eight to 10 minutes to find him, and agreed it was "probably" around 6:40 p.m. when she did so. She then testified that she and appellant argued briefly before going from his grandmother's house to Mama Cat's apartment.

J.O. also addressed the relevant timeframe in a recorded statement to law enforcement, which was admitted into evidence and played for the jury. J.O. did not recall what time she and appellant parked near Tent City but stated they "were sitting there for a while." Around 6:00 p.m., appellant took a speaker from the back of the car, charged it, played loud music, and then went to mingle with people in the area before disappearing from her sight. J.O. stated she was concerned appellant might be with another woman, but she remained in the car for "a long time," which she estimated was about 30 minutes, before she "finally decide[d] to go look for [him]." She asked people in the area whether they had seen appellant, then drove around looking for him until she found him at his grandmother's house.

During closing argument, the prosecutor commented on J.O's alibi testimony as follows:

> "Now [J.O.], she could not narrow down the time that she had regained contact with [appellant]. Recall that they were playing music. They were near Tent City, that type of thing. She said that [appellant] takes off. She's worried he's talking to another girl. She goes looking for him; right?

> "She says [appellant] left her at about 6:00 p.m., but she couldn't narrow down the time frame of when she saw him again; right?"

Later, during rebuttal, the prosecutor stated:

16.

"So what did [J.O.] say?· They were hanging out all day…. They were hanging out all day, listening to music. He bailed at six o'clock to go talk to another girl, she thought; right? Then she can't tell you when she found him again."

Appellant contends the prosecutor's statements that J.O. could not "narrow down" or "tell you" when she next saw appellant misstated the record. He argues J.O. did testify that she found appellant at his grandmother's house around 6:40 p.m., a point he characterizes as critical because it was approximately one hour before the shooting. Appellant further argues counsel was ineffective for failing to object because the defense at trial was identity and alibi, and the prosecutor's alleged misstatement both undermined J.O.'s alibi testimony and recast it as inculpatory evidence placing appellant at the shooting scene.

"Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. [Citations.] A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823.)

The record does not support appellant's characterization of the prosecutor's argument. The prosecutor did not deny that J.O. gave some account of when she next saw appellant after he left their car. Instead, the prosecutor argued that J.O.'s account did not provide a reliable alibi because the timeframe she described was equivocal and vague. That argument was supported by the record. At trial, J.O. testified appellant left around "6:30-ish" and agreed she "probably" found him around 6:40 p.m. But in her law enforcement interview, she was less precise, stating only that appellant retrieved a speaker around 6:00 p.m. and that she decided to look for him about 30 minutes after he left the area. Her description of the surrounding events, including appellant charging the speaker before leaving, and her later efforts to locate him by asking bystanders and driving around, permitted the prosecutor to argue that the timeframe was broader and less certain than appellant claims.

"A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) We conclude the prosecutor's argument fell within that latitude. Given the ambiguities in J.O.'s testimony and its inconsistencies with her prior statement, the prosecutor could fairly argue that J.O. was unable to "narrow down" when she next saw appellant. The argument permissibly addressed both the substance of J.O.'s testimony and her credibility. Accordingly, the prosecutor did not misstate the evidence, and counsel was not ineffective for failing to raise a meritless objection. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

### C.    *Comments regarding inconsistent defense theories.*

Defense counsel's closing argument centered almost exclusively on identity and alibi. Near the end of the argument, counsel briefly addressed malice aforethought, while making clear the defense theory was that appellant was not the shooter: "I'll discuss with you briefly malice aforethought, but I'm not going to spend an awful lot of time with that, ladies and gentlemen. Quite candidly, we submit, [appellant] did not commit the act." Soon after, counsel argued there was "no malice aforethought" because there was no evidence of a motive or conflict between appellant and Llamas.

At the start of rebuttal, the prosecutor stated:

"My argument is going to be limited to responding to what [defense counsel] has submitted to you in terms of argument.

"And because of that, I'm confused. Was it not him? Or did we not prove intent? Can't have it both ways.

"So the argument about circumstantial evidence proving intent of [appellant]? Well, if there is an alibi, he didn't do it. Why are we talking about the intent? Again, you can't have it both ways.

"I submit to you that pointing a gun, firing once, pausing, re-aiming and then firing six more times is circumstantial evidence of intent in this case."

The prosecutor then turned to appellant's alibi and identity defense.

Appellant claims the prosecutor misstated the law by asserting he "can't have it both ways," because a criminal defendant is permitted to advance inconsistent or alternative theories of defense. According to appellant, the argument improperly suggested he was required to choose between his identity/alibi defense and his challenge to the malice element, and thus, contesting malice amounted to a tacit concession that he was the shooter. Appellant also maintains the prosecutor's one "way" framing implied that appellant bore the burden of proving his alibi, rather than simply identifying evidence that could raise a reasonable doubt as to identity.

A criminal defendant may rely on inconsistent defenses. (*People v. Atchison* (1978) 22 Cal.3d 181, 183; *People v. Sedeno* (1974) 10 Cal.3d 703, 720, overruled on another ground by *People v. Breverman* (1998) 19 Cal.4th 142, 149.) But appellant identifies no California authority addressing whether, or under what circumstances, a prosecutor may comment on the inconsistency between alternative defense theories, and we are aware of none. Appellant instead relies on *State v. Tahah* (2015) 302 Kan. 783, 791, where the prosecutor made a similar, but more extensive, argument that a murder defendant " 'cannot have it both ways' " by denying he was the shooter while also arguing he lacked the intent to kill.[9] The Kansas Supreme Court held the argument misstated the law because the defendant was "entitled to offer factually inconsistent defenses to the jury," but concluded the error was harmless. (*Id.* at p. 791.)

---

[9]     The challenged argument in *State v. Talah* was considerably more elaborate than the brief comment at issue here: " 'Aristotle, the great philosopher, wrote extensively on logic. He concluded that two contradictory statements cannot coexist in the truth. In a layman's terms, you cannot have it both ways. The Defendant cannot claim, on one hand, he was not there and did not pull the trigger and kill [the victim], at that same time claim that if he was there, it was unintentional and reckless. [¶] … [¶] An example would be J.F.K.'s assassination. Lee Harvey Oswald, like him saying I was not there on the sixth floor of the depository, of the Texas book depository, and did not pull the trigger. But, if I was, it was all just accidental or reckless, not intentional.' " (*State v. Tahah*, *supra*, 302 Kan. at pp. 790–791.)

Here, we need not determine whether the prosecutor's argument amounted to a misstatement of *California* law because, even assuming counsel should have objected, appellant has not shown prejudice. The challenged statements must be considered in the context of the argument as a whole. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) The prosecutor was responding to defense counsel's brief argument that the evidence failed to establish malice. Although the prosecutor noted the tension between that assertion and the identity and alibi theory counsel had just emphasized, he did not argue appellant was legally barred from advancing inconsistent defense theories or that one theory necessarily defeated the other. The prosecutor's point—captured by his rhetorical question, "why are we talking about intent?"—was that counsel's malice argument had little force because the defense had focused almost entirely on identity and alibi, and because the circumstances of the shooting overwhelmingly established the intent to kill.

Viewed in context, there is no reasonable likelihood the jury understood the prosecutor's "can't have it both ways" comments in the manner appellant claims. The prosecutor did not suggest appellant had to elect a defense, tacitly admitted he was the shooter, or bore the burden of proving his alibi. His comments were plainly directed at counsel's alternative malice theory and served as a transition back to the defense's principal theory that appellant was not the shooter.

The jury instructions further undermine any claim of prejudice. The court instructed the jury that the prosecution bore the burden of proving each element beyond a reasonable doubt (CALCRIM No. 220), including that appellant was present and committed the charged crimes (CALCRIM No. 3400). The court also instructed the jury to follow the law as stated by the court, even if an attorney's comments conflicted with the instructions (CALCRIM No. 200). We presume the jury followed those instructions, and nothing in this record suggests the prosecutor's brief comments caused the jury to disregard or misapply them. (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 75; *People v. Morales* (2001) 25 Cal.4th 34, 47.) Thus, to the extent the "can't have it both

20.

ways" comments were objectionable, appellant has not shown a reasonable probability the result would have been different had counsel objected. (See *People v. Jennings, supra*, 53 Cal.3d at p. 357.) We therefore reject the claim.[10]

### D.      Comments regarding inconsistent alibi testimony.

In rebuttal, the prosecutor addressed the alibi testimony of J.O. and B.N. as follows:

> "And, you know, the funny thing about an alibi is when you have two people that are giving an alibi, your timing should matchup. Don't you think?
>
> "So what did [J.O.] say? They were hanging out all day. He wasn't at [his grandmother's] house taking a nap. They were hanging out all day, listening to music. He bailed at six o'clock to go talk to another girl, she thought; right? Then she can't tell you when she found him again.
>
> "[B.N.] says, oh, no, I got home at 3:15, and he was asleep for at least two and a half hours. Well, that puts you at 5:45. So were you listening to music, or were you sleeping at the house? Your alibis are lies."

Appellant contends the prosecutor misstated the law by arguing, in substance, that inconsistent alibi witnesses "cancel each other out." He asserts the argument was improper because conflicting evidence may itself give rise to reasonable doubt. In appellant's view, the prosecutor's comments suggested he was "bound" by his alibi witnesses' testimony and bore the burden of presenting only consistent alibi evidence.

We disagree. The prosecutor did not state or suggest that inconsistent alibi testimony was legally incapable of creating reasonable doubt. Rather, the prosecutor permissibly attacked the credibility of the alibi witnesses based on the evidence. A "prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial." (*People v. Thomas* (1992) 2 Cal.4th 489, 529) "[H]arsh and colorful

---

**10**      Because we conclude appellant was not prejudiced by counsel's failure to object to the alleged misconduct, we also reject his related claim that counsel's failure amounted to the "withdrawal of a potentially meritorious defense … requiring per se reversal of the judgment." (*People v. Diggs* (1986) 177 Cal.App.3d 958, 971.)

attacks on the credibility of opposing witnesses are permissible" so long as they are reasonably warranted by the evidence. (*People v. Arias* (1996) 13 Cal.4th 92, 162, italics omitted; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [prosecutor may refer to testimony as " 'lies' " if based on inferences drawn from the evidence].)

As the prosecutor pointed out, J.O.'s and B.N.'s accounts of appellant's whereabouts on the day of the murder were factually irreconcilable. That conflict necessarily undermined the credibility of at least one of them, if not both. The prosecutor was therefore entitled to argue the jury should reject both accounts. The challenged comments were not a misstatement of law, but a permissible attack on the weight and credibility of the alibi testimony. Accordingly, counsel was not ineffective for failing to object, and this claim is without merit.

## DISPOSITION

Appellant's conviction on count 2 is reversed for insufficient evidence. The associated use of a firearm enhancement on count 2 is vacated. Appellant's sentence is vacated and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

SNAUFFER, J.

DESANTOS, J.

22.